STATE OF MAINE
HANCOCK, SS.

SUPERIOR COURT
DOCKET NO. CV-14-52

John Sweet              )
      Plaintiff        )
                     )    FINDINGS, DECISION AND
      v.               )    JUDGMENT
                     )
Carl & Elizabeth Breivogel  )
      Defendants    )

## FACTUAL FINDINGS

The plaintiff, John Sweet, is a sole proprietor engaged in the construction of traditional timber frame homes. Traditional timber frame construction is a unique form of construction that typically involves a significantly higher level of labor, time and craftsmanship.

The defendants had acquired land in Mt. Desert, and in the winter of 2013 began searching for potential homebuilders to construct a residence on their purchased land. In that regard, the defendants visited the plaintiff's website and made an initial inquiry on or about February 12, 2013 regarding "an enclosed, whether-tight timber frame home." (Plaintiff's Ex. 1).

The plaintiff responded to the defendants' inquiry and began a dialogue regarding the defendants' needs, and what services the plaintiff could provide. Those discussions led to a visit, in person, by the defendants to the plaintiff's residence, which was also the site of his business operations. Specifically, on March 18, 2013, the defendants viewed the plaintiff's own

1

28 x 30 traditional timber frame home which he had constructed. This visit occurred prior to any agreement reached between the parties regarding the construction of a home for the defendants.

During the visit at the plaintiff's home, the defendants were told by the plaintiff that it would cost $500,000 to build a home like the plaintiff's. During the same visit, the plaintiff also showed the defendants some other traditional timber frame homes he had constructed which were somewhat larger than his own home. One additional such home was a 32 x 32 house which cost $400,000 to construct to the level of being little more than weathertight.

After the defendants returned home from their visit with the plaintiff, the parties continued an exchange of emails. Specifically, in a series of emails which were shared March 26, 2013 the parties began to discuss costs associated with constructing a home for the defendants. This is also the point at which there began to be a divergence between the parties as to the nature and extent of the specific work to be performed for the dollar amounts which were being considered.

The defendants asked the plaintiff whether a salt box style temporary home could be constructed for about $275,000, not including the septic. The plaintiff responded that it was possible but it was difficult to say at that early stage. It is clear from the evidence at trial that the actual work being contemplated for the $275,000 price was different as between the parties. The plaintiff understood the work being requested was for the construction of an enclosed, weathertight timber frame home. This level of construction,

2

which was also referred to as a "dried shell structure" would involve the following components:

-excavation

- eight or 10 inch foundation

- placement of the timber frame structure on the foundation

- enclosure of the frame with walls and roofs

- insulation

- roof covering with tarpaper and asphalt shingles

- installation of Marvin Windows

- Cedar shingles on the sidewalls

- window and door flashings

- full chimney installation.

The plaintiff did not understand this level of construction to include a fully completed home with all of the amenities finished and ready for ocupancy.

The defendants, however, were envisioning a fully completed home ready for occupancy with respect to their inquiry regarding the $275,000 budget. Each of the parties mistakenly proceeded under the assumption that the other party shared that party's understanding of the scope of the work to be performed for $275,000.

Thus, the defendants authorized the plaintiff to begin construction of their new home on or about April 13, 2013 at a cost not to exceed $275,000. The parties further agreed that the defendants would be billed for any labor performed at the rate of $32 per hour in addition to the materials utilized.

3

Despite inquiry from the defendants, the plaintiff refused to prepare a written contract regarding the work to be performed in constructing the defendants' home. The plaintiff told the defendants that he had never signed a written contract in over 30 years of construction work. The plaintiff's lack of adherence to formal written contracts was also consistent with his very informal approach to record-keeping, plan designing and general documentation. The plaintiff did, nonetheless, regularly communicate with the defendants by sharing progress photographs and providing invoicing on basically a biweekly basis.

Although the plaintiff's testimony was somewhat inconsistent as to his status as a general contractor for this project, the court finds that the plaintiff was functioning in that capacity. The plaintiff made numerous recommendations regarding subcontractors, the billing for the subcontractors work went through the plaintiff, the plaintiff charged a markup to the defendants for the subcontractors work, and the plaintiff generally directed the timing of the subcontractors work on the project.

Throughout the summer and fall of 2013, the plaintiff proceeded to construct a "dried shell structure" (as defined above) on the defendant's property in Mt. Desert. Based upon the evidence presented through the photographs (plaintiff's Exhibit 101) and timesheet entries (Plaintiffs Exhibits 218, 219) the court concludes that the "dried shell structure" was not completed until December 14, 2013.

The amounts actually billed by the plaintiff through that date, December 14, 2013, totaled $312,257.79. (Defendants Exhibit 64). Despite the confusion

4

regarding the level of work which was to be performed for an amount not to exceed $275,000, as discussed above, there is no dispute that the parties understood that at least a "dried shell structure" should have been completed at a cost not to exceed $275,000. The court finds that the cost to perform that function did exceed the agreed to price by $37,257.79.

By early December, both parties understood that the plaintiff would continue to perform construction services beyond merely completing a "dried shell structure." Although the defendants did not inform the plaintiff of their specific plans, they intended to continue to utilize the plaintiff's services until a certificate of occupancy was obtained, and then proceed to initiate legal action to attempt to recover any funds paid to the plaintiff in excess of $275,000.

The plaintiff, and his subcontractors, continued to perform construction services for the defendants after December 14, 2013, the date the "dried shell structure" was completed. That additional work was billed at $32 per hour for all labor performed. In a similar manner as before, the plaintiff continued to invoice the defendants on basically a biweekly basis. The defendants continued to pay the plaintiff up until the invoice which was dated May 4, 2014. (Plaintiff's Exhibit 325). The certificate of occupancy for the defendants' home was issued on or about May 15, 2014.

The total amount billed to the defendants for labor and material performed after December 14, 2013 (the date the "dried shell structure" was completed) was $327,250.98.(Defendants' Exhibit 64). Without adjustment, as discussed below, the total amount the plaintiff would be entitled to for the

5

construction services performed would equal $602,250.98. ($327,250.98 + $275,000). The defendants have paid a total of $601,195.75 to either the plaintiff or direct payments to two of the plaintiff's subcontractors. (Defendants Exhibit 65).

As noted above, the plaintiff's record-keeping and documentation especially relating to the hours of work performed by his workers was very informal. Although the parties had agreed that all of the workers' work was to be billed at the rate of $32 per hour, the testimony at trial suggests that one of the worker's time was being adjusted inappropriately to result in the defendants paying the equivalent of $35 per hour for Carl Carter's services. Specifically, after December 14, 2013, the defendants were billed for 617 hours of time purportedly worked by Carl Carter, (Defendant's Exhibit 66), at the rate of $32 per hour. In actuality, the plaintiff adjusted the amount of hours at the rate of $32 per hour to reflect the total amount the plaintiff would have received had Mr. Carter been billed at the rate of $35 per hour. The testimony presented by the plaintiff and the plaintiff's spouse suggests the following mathematical adjustment occurred in regard to the billing for Carl Carter's time.

617 hours x $32 per hour = $19,744 in billed time
$19,744/$35 per hour = 564 hours actually worked
564 hours x $32 per hour = $18,048 (the correct charge for Carter's work)
$19,744 - $18, 048 = $1,696 (Defendants' overpayment for Carter's work).

With this adjustment, the court concludes the defendants were obligated to pay $600,554.98 for the services performed by the plaintiff in connection

with the construction of their home in Mt. Desert. The defendants, in fact, paid a total of $601,195.75, reflecting a total overpayment in the amount of $640.77.

The court also concludes that the defendants have failed to demonstrate that the work performed by the plaintiff in constructing the home was negligent, breached any contractual obligation to perform such work in a workmanlike manner, or that any implied warranty relating to workmanship was breached. Nor does the court find that the plaintiff's behavior or conduct constituted either fraud or negligent misrepresentation.

## LEGAL ANALYSIS

The parties, in their respective Complaint and Counterclaim have asserted a total of 12 counts claiming entitlement to relief under various legal theories.

### 1. Plaintiff's Complaint

Based upon the court's factual findings as set forth above, any entitlement to relief by the plaintiff is limited to his claim as set forth in Count 2 based upon a theory of quasi-contract or quantum meruit.

As the Law Court set forth in *Paffhausen v. Balano, 1998 ME 47, 708 A.2d 269, 271,*

> [a] valid claim in quantum meruit requires: "that (1) services were rendered to the defendant by the plaintiff; (2) with the knowledge and

consent of the defendant; and (3) under circumstances that make it reasonable for the plaintiff to expect payment." [Internal citations omitted]. While the formalities of an express contract are not a prerequisite to recovery in quantum meruit, there must be a reasonable expectation on the part of the claimant to receive compensation for his services and a "concurrent intention" of the other party to compensate him.

. . . .

Quantum meruit may lie when "there was not a clear accession on both sides to one and the same terms," if services are provided "under circumstances that negative the idea that the services were gratuitous." [Internal citations omitted].

Although this court concludes that the plaintiff, under a theory of quantum meruit, was entitled to payment for the services he rendered to the defendants in constructing their completed home sometime in the latter part of May 2014, the plaintiff has not established that he is entitled to any additional payment beyond the $600,554.98 which has already been paid by the defendants.

Also, because the court concludes that the quantum meruit analysis is the appropriate basis for review based on the facts of this case, relief under any theory of breach of contract, unjust enrichment, or account annexed as set forth in Counts 1, 3 or 4 would not properly be available. Moreover, because the court concludes that the defendants have paid the plaintiff slightly in excess of the amount he is due for the work he performed, the

8

defendants would be entitled to assert a "double payment" defense with respect to the lien claim set forth in Count 5 of the plaintiff's Complaint.

2. Defendant's Counterclaim.

Based upon the factual findings as set forth above, the court concludes the defendants have failed to meet the burden of proof necessary to establish any of their claims based upon negligence (Count 2), breach of contract (Count 3), fraud (Count 4), negligent misrepresentation (Count 5), or breach of implied warranty of workmanship (Count 7).

The court does find that the contract between the parties for the construction of the defendants' home in Mt. Desert does fall within the parameters of Maine's Home Construction Contracts Act. 10 MRSA §§1486 et seq. That Act, in part, requires that, "any home construction contract for more than $3000 in materials or labor must be in writing . . . " The plaintiff clearly failed to comply with this statutory requirement.

This same statute, at §1490, indicates that any violation of the act shall constitute prima facia evidence of a violation of the Unfair Trade Practices Act. Count 1 of the defendant's Counterclaim alleges such a claim.

The Law Court addressed the interplay between the Home Construction Contracts Act and the Unfair Trade Practices Act in its decision in *Parker v. Ayre, 612 A.2d 1283 (Me. 1992)*. In *Parker*, the procedural status of the case involving the contractor's complaint for unpaid fees, the homeowner's counterclaim based upon a violation of the Home Construction Contracts

Act, and the court's analysis of the parties' relationship based upon quantum meruit, is virtually identical to the issues presented in this case. The court in *Parker* found a violation of the Home Construction Contracts Act based, in part, upon the lack of a written contract, and yet concluded that the homeowner was not entitled to relief under the Unfair Trade Practices Act because the homeowner failed to demonstrate, "a loss of money or property as a result of the the oral contract." *Id at 1285.*

In this case, again based upon the court's factual findings from above, the defendants have suffered a relatively slight loss of money in the amount of $640.77. The court concludes that that loss of money does entitle the defendants to recovery under the Unfair Trade Practices Act. Accordingly, Judgment is hereby entered in favor of the defendants in the amount of $640.77 as to Count 1 of their Counterclaim.

Count 6 of the defendant's Counterclaim again asserts a violation of the Home Construction Contracts Act but specifically seeks the assessment of a civil penalty pursuant to section 1490(2). That subsection states, in part,

> 2. Civil penalty. Each violation of this chapter constitutes a civil violation for which a forfeiture of not less than $100 nor more than $1000 may be adjudged. No action may be brought for a civil violation under this subsection more than two years after the date of the occurrence of the violation.

The companion penalty provisions under the Unfair Trade Practices Act (5 MRSA §212) more specifically clarify that any civil penalty which might be

assessed pursuant to that Act be payable to the State, and that any action filed pursuant to § 212 would be brought by the Attorney General.

This court concludes that the civil penalty provisions of the Home Construction Contracts Act are also provisions by which any assessments could only be paid to the State, and not any aggrieved private party.[1] Accordingly, the defendants are entitled to no relief with respect to Count 6 their Counterclaim.

The Clerk is directed to incorporate this Findings, Decision And Judgment, by reference, in accordance with MRCivP 79(a) as follows:

As to the Complaint:
- Count 1: Judgment for the Defendants;
- Count 2: Judgment for the Defendants;
- Count 3: Judgment for the Defendants;
- Count 4: Judgment for the Defendants; and
- Count 5: Judgment for the Defendants.

As to the Counterclaim:
- Count 1: Judgment for the Defendants in the amount of $640.77 plus interest and costs;

---

[1] The Court would also note that the claim in Count 6 of the Amended Counterclaim (this claim for relief was not asserted in the original Counterclaim) was filed October 2, 2015, well beyond the two year period of the occurrence of the violation regarding the lack of a written contract.

11

- Count 2: Judgment for the Plaintiff;
- Count 3: Judgment for the Plaintiff;
- Count 4: Judgment for the Plaintiff;
- Count 5: Judgment for the Plaintiff;
- Count 6: Judgment for the Plaintiff; and
- Count 7: Judgment for the Plaintiff.

Date: 11/16/17

SUPERIOR COURT JUSTICE

12